UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| vs. | : | CASE NUMBER 3:03 CR 182 (SRU) |
| ALBERT LATOUCHE | : | MARCH 12, 2005 |

### DEFENDANT'S SENTENCING MEMORANDUM

The following memorandum is submitted for the Court's consideration regarding the sentencing of Mr. Albert LaTouche. Following a jury trial, the defendant was convicted of nine (9) counts of Mail Fraud, in violation of Title 18, United States Code, Section 1341.

Although the application of the United States Sentencing Guidelines is not mandatory but rather advisory, his total offense level is calculated to be 18. Since Mr. LaTouche has no prior criminal history, his guideline range is calculated to be 27-33 months. The defendant does not agree with the probation officer's offense level computation because he does not believe a two-level upward adjustment for *more than minimal planning* pursuant to U.S.S.G. §2F1.1(b)(2) is warranted. This issue will be discussed in more detail in Section II of the defendant's sentencing memorandum.

In this sentencing memorandum, the defendant respectfully sets forth several grounds that warrants a downward departure from the sentencing guidelines. In particular, the defendant relies, both individually and in combination, upon the following factors which justify a downward departure; Mr. LaTouche's age and his ability to pay restitution; that the guidelines do not take into account the age of a defendant before obtaining a criminal record; the defendant's voluntary disclosure of the offense; and that the defendant's conduct was not a "heartland" mail fraud case.

**I.     BACKGROUND**

Albert LaTouche was the president of Global Telecom Services, LLC d/b/a Medical Disposal Devices (hereinafter GTS/MDD). This corporation had two separate businesses operating under the GTS umbrella; 1) selling "900" telephone numbers, and 2) marketing the *Needlyzer*. Sometime in the mid 90's, Albert LaTouche and his partner Donald Maine started this business venture. Initially, the business was simply the "900" numbers. While Maine ran the "900" telephone number business, LaTouche continued with his full-time job as a dispatcher for a Connecticut fuel oil distributor. However, when GTS received a proposal from Brian LaTouche to market the *Needlyzer*, Albert LaTouche sought and recruited a person with some marketing background who could assist them with this aspect of the business. He recruited Salvatore Cartelli, a former acquaintance who had experience running several service stations in the Middletown area. Through his prior dealings with Cartelli, LaTouche had no reason to believe Cartelli was dishonest or disreputable. Consequently, they entered into an oral agreement for Cartelli to market and sell the *Needlyzer*.

To successfully market the *Needlyzer* the partners devised a business plan. It called for Cartelli to use his sales contacts throughout the United States, as well as his own contacts in the medical field, to establish a network for marketing the device overseas. Any orders for the *Needlyzer* that derived from Cartelli's efforts would be submitted to Albert LaTouche who would then forward the purchase orders to his brother. Brian would then submit the orders to his partner, Bob Hall. Periodically, Cartelli would update LaTouche on the progress of his marketing campaign. He informed LaTouche of several contacts he had made with hospitals and medical supply facilities expressing interest in the product.

As the marketing campaign for the *Needlyzer* progressed, Cartelli set up official letterhead with the Medical Disposal Device slogan (Don't Get Stuck With Someone Else's Problem) as well as creating a brochure for the product. He also opened a checking account with Fleet Bank. To fund the project, LaTouche tapped into his personal savings to the tune of approximately $250,000. Maine also contributed financially to the business, although a much smaller amount. However, the money quickly ran out so LaTouche and Maine were forced to obtain a Small Business Loan in the amount of $100,000 to keep the business going. Cartelli never invested a dime in the business.

Salvatore Cartelli was acquainted with an engineer named Joe Scaffedi who was Vice President of Manufacturing for a company in Long Island called the Dayton T. Brown Company. Cartelli recruited Scafidi to manufacture the *Needlyzer* in return for being a silent partner in the GTS/MDD business. At some point, LaTouche, Cartelli and Maine toured the Brown Company with Scafidi to see where the *Needylzer* would be manufactured. LaTouche was assured by Scafidi and Cartlli that the Brown Company could handle any orders produced by GTS/MDD.

Over the next several years, Cartelli assumed control of the accounting. banking records and daily operations of the business. LaTouche and Maine had very little knowledge about where the money was going. It was during this time, late '96 or early '97, that Cartelli showed LaTouche a list of individuals who claimed they had patent rights to the *Needlyzer*. Cartelli informed him that had retained the services of a patent lawyer in New York City (Attny Bob Faber) who, according to Cartelli, advised him to sell the product overseas because no one could establish they owned the exclusive patent rights to the device. Pursuant to Faber's recommendation, GTS/MDD started marketing their product overseas.

Cartelli also informed LaTouche that he had a working relationship with a contact at the Food and Drug Administration (FDA) named Lucas who could get them approval for the *Needlyzer* within thirty days of their application.

In February of 1997, LaTouche began seeking investors for the *Needlyzer* business. In a little over three years, approximately 40 investors contributed money to the business venture. Most of the investors were family members, friends, co-workers or acquaintances of LaTouche, and they signed contracts relating to their investments. After months of hollow promises, Sal Cartelli held a meeting in early '98 for approximately a half dozen disgruntled investors who were given the option of having their investment monies returned. However, after some deliberations, the investors all continued to support the product and remained fully vested in the company. In April of '98, GTS/MDD began distributing monthly newsletters to its investors to apprise them of the status of their investments. This information included potential contacts with the Vatican, Guatemala, England, Singapore and several others countries. All of the information contained in the newsletters came from Cartelli, excluding Guatemala. LaTouche and Maine traveled there themselves in April of '97 and had a business meeting with several doctors who expressed interest in the *Needlyzer* device.

Throughout the *Needlyzer* venture, LaTouche never supervised Cartelli in the daily operations of the business. It was Cartelli who ran the day-to-day operations of the company.

**II.    TWO-LEVEL UPWARD ADJUSTMENT FOR *MORE THAN MINIMAL PLANNING* NOT WARRANTED**

The defendant objects to a two-level increase in his offense level for *more than minimal planning*. Generally, a finding of *more than minimal planning* is fact-specific. Almost all crimes involve some degree of planning. However, the amount of planning must be sufficient to justify the enhancement. It is uncontested that beginning in April of 1998 and running through October of 1999, the defendant knowingly distributed monthly newsletters to the investors summarizing GTS/MDD's events of the preceding month. It is the government's contention that the information discussed in the newsletters and the materials attached to said mailings were all false and fraudulent with the purpose to mislead the investors and give them a false sense of security with there investments. The defendant strongly disputes that he had any knowledge of the intentional falsehoods contained in same and submits that the mailing were sent to inform the investors concerning the progress with their overseas marketing of the device. The information contained in the newsletters was obtained solely from Salvatore Cartelli. There was no sophisticated plan drawn up between LaTouche and Cartelli to defraud investors of their monies. It is the defendant's contention that even Cartelli had sincere motives at the start of the *Needlyzer* venture. It was not until the overseas deals continuously began falling apart that Cartelli started falsifying documents. Although the mailings were repeated on a monthly basis, the repetitive nature of the conduct by itself should not warrant this adjustment. There must be a showing that the defendant had knowledge of the fraudulent content of each mailing. The defendant submits that the government has failed to establish this fact. Therefore, a two-level upward adjustment is not appropriate.

### III.  REASONS FOR GRANTING A DOWNWARD DEPARTURE

**A.  <u>Age of the Defendant and His Ability to Make Restitution</u>**

Pursuant to U.S.S.G. §5H1.1, "age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration". Presently, Mr. LaTouche is 68 years old and in relative good health. However, due to his squandering of his family's life's savings, he cannot relax or ease into the golden years of retirement. Rather, he must work 50 to 60 hours per week as a dispatcher for a heating fuel company to keep his finances in order. During the recent winter months, he's been averaging 60+ hours per week, and the daily stress of the job has been taking a physical toll on him.

It is anticipated that the court will require the defendant to make restitution to the victims, joint and severally, in the amount of $750,000. Certainly, the likelihood of the defendant ever making full restitution in his lifetime is questionable. However, if he were allowed to remain at liberty instead of being sent off to prison, and be required to continue to remain employed full-time with his company, the victims would stand a much better chance of recouping some of their losses.

Over the past several years, Mr. LaTouche has shown he can, and will, fulfill his financial obligations as he has stipulated to in two lawsuits which were filed against him relating to this matter. Since January 2002, Mr. LaTouche has been making monthly payments to the Gottiers (one of the investors) in the amount of $400/month. To date he has paid them approximately $16,000 towards the $26,000 that was stipulated to as a judgment. LaTouche has also been making monthly payments to the Nettletons (another investor) since

January 2004 in the amount of $100/month. Allowing the defendant to remain gainfully employed would do more good for the victims then sending him off to jail.

Of course, the Court must factor into consideration the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence to criminal conduct. 18 U.S.C. §3553. An argument can be made that Sal Cartelli's sentence of 42 months sends a strong message to the community that schemes to defraud will not be tolerated and that courts will impose stiff sentences to offenders who are convicted. The track record of Salvatore Cartelli establishes a high statistical probability that he will never fulfill his restitution requirement. His checkered employment history and unsavory conduct, coupled with his constant reliance upon family and friends for financial support, demonstrates his unwillingness to earn an honest living. To the contrary, LaTouche's work ethic is the antithesis of Cartelli's. For the past forty years he has been employed as a fuel oil dispatcher and has earned the respect and recognition of his employer for the skill and professionalism he brings to the job every day.

It should be noted that the majority of *Needlyzer* investors were friends, family members and co-workers of the defendant. But for a few, most of the investors would rather get their money back then have the defendant go off to jail. When balancing the factors set forth in §3553, the investors would be far better off if Mr. LaTouche were sentenced to home confinement and only be permitted outside of the home for full-time employment. If the defendant is sent to jail, his job will be lost and the investors will never be made whole.

Hence, a downward departure is appropriate in this circumstance.

**B.    Length of Time Until Defendant's First Conviction**

During the period of time covered by the indictment, Mr. LaTouche was between the age of 60 and 63 years old. Given that this is his first ever criminal conviction, a departure is warranted under section 5K2.0 because the Sentencing Guideline's Criminal History Category does not adequately take into account the length of time someone refrains from the commission of a crime. While it is true that a defendant's age will not normally justify a downward departure, see U.S.S.G. § 5H1.1, a departure in this case would not be based specifically on Mr. LaTouche's age alone. Instead, the departure would be based on the consideration that for approximately 60 years, the defendant led a crime-free life, and the fact that the guidelines simply do not account for this circumstance. See generally, United States v. Ward, 814 F.Supp. 23, 24 (E.D.Va. 1992).

In Ward, a case involving a forty-nine year old defendant, the court departed based on the length of time before the defendant's first offense because it found that the Sentencing Commission failed to take into account the length of time an individual might go before sustaining their first conviction. Id. The court reasoned that,

> [w]hile awarding defendants generally and this defendant individually some credit for leading relatively crime-free lives, the Criminal History Category of the Sentencing Guidelines does not account for the length of time a particular defendant refrains from criminal conduct. Thus, for example, the guidelines do not distinguish between a nineteen-year old and a sixty-year old, both of whom had led crime-free lives and consequently are assigned the same low Criminal History Category …the longevity of the sixty-year olds criminal history is not taken into account…[T]he length of time a person refrains from the commission of crimes…is a factor that is critical to a court's determination of the sentence it should impose.

Id. This logic applies with equal force in Mr. LaTouche's case. Since the Sentencing Commission has failed to take this factor into consideration, a downward departure would be appropriate.

**C. <u>Voluntary Disclosure of Offense</u>**

The Sentencing Guidelines permit a downward departure in a case where the defendant "voluntarily discloses to authorities the existence of, and accepts responsibility for, the offense prior to the discovery of such offense." U.S.S.G. §5K2.16 (2002). In Mr. LaTouche's case, he provided investigators with significant evidence relating to the failed *Needlyzer* business. He initially hired a private investigator to determine whether his co-defendant, Salvatore Cartelli, was engaging in fraudulent activity. This occurred in August of 2000. (Exhibit A-CFI Associates, Private Investigator's Report, dated August 17, 2000). Subsequently, on May 10, 2001, he met with FBI Special Agent Russell Brown and Assistant United States Attorney Calvin Kurimai and disclosed in great detail the circumstances surrounding the formation of the businesses "Global Telecom Services" and "Medical Disposal Device". (See attached Exhibit B-FBI 302 of May 10, 2001 interview). He also provided them with supporting documentation of the business, including newsletters, bank records, investor lists, and business correspondences. Much of this evidence was later used at trial by the government in its case in chief against the defendant. A significant portion of this evidence would not have been discovered by government had the defendant not voluntarily provided it to them.

Although Mr. LaTouche went to trial instead of pleading guilty to the offense, he demonstrated his acceptance of responsibility for his role in the offense by taking the stand and acknowledging under oath that he was not truthful to some of the investors when he advised them that Medical Disposal Device held the patent to the device and had received FDA approval.

The defendant believes his early cooperation in the investigation of this case and his truthful admissions at trial should be considered by the Court when determining an appropriate sentence. Thus, under section 5K2.16, a departure is warranted.

### D.  Defendant's Conduct Is Not A Heartland "Mail Fraud" Case

Neither the Sentencing Reform Act nor the Sentencing Guidelines were designed or intended to eliminate a sentencing court's ability to depart from an established sentencing range in an appropriate case. The Sentencing Commission's decision to vest broad departure powers in the District Court is based, in part, on its recognition of the obvious difficulty inherent in prescribing "a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision." U.S.S.G., Ch.1,Pt.A(4)(b). A sentencing courts may depart from a guideline specified sentence whenever they find "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b); Koon v. United States, 518 U.S. 81, 94 (1996); Zecevic v. U.S. Parole Commission, 163 F.3d 731, 734 (2d Cir. 1998). The Commission has explained that courts should treat each guideline as carving out a "heartland", that is a set of typical cases embodying the conduct that each guideline describes. When a court finds an "atypical" case, one to which a particular guideline linguistically applies but where the conduct significantly differs from the norm, the court can and should consider whether a departure is warranted. U.S.S.G., Ch.1,Pt.A(4)(b); United States v. Millikowsky, 65 F.3d 4 (2d Cir. 1995).

The Court heard six days of testimony concerning the MDD mail fraud scheme. Counsel believes that the evidence establishes the defendant was not only a pawn of co-defendant Cartelli, he was also a victim of Cartelli's fraud and deceit. Mr. LaTouche truly

believed in the *Needlyzer* product. His belief in the product was so strong that he invested approximately a quarter of a million dollars of his own hard earned personal savings into the success of this business venture.

To demonstrate his faith in the product, LaTouche toured the Dayton T. Brown facility where the *needlyzer* was to be manufactured. He also traveled to Guatemala with his partner, Donald Maine, and held a demonstration for several doctors who were interested in purchasing the device. Although LaTouche's realm of reality may have been distorted, his "pie in the sky" dreams of securing financial success for himself and his investors was truly heartfelt. His biggest downfall came when he placed his blind trust in his so called friend, Salvatore Cartelli. Being unsophisticated in the world of marketing strategies and corporate dealings, and lacking any sort of business savvy, LaTouche entrusted his own life's savings, as well as those of his friends and family members who had also invested in the company, in the hands of Cartelli based upon his word that he (Cartelli) would watch out for everyone's best interest. LaTouches's unbridled belief in Cartelli may have been foolish and totally naïve, but it certainly was not ill-gotten.

As president of GTS, LaTouche does not contest that he failed to independently verify any of the information that Cartelli provided to him about his progress in marketing the *Needlyzer* device. However, in all fairness to LaTouche, whenever he confronted Cartelli about an investors' concerns, Cartelli would always produce a document or some other evidence that seemed to corroborate what he was telling him. This would inevitably allay LaTouche's concerns, and he in turn would pass this information on to the investors. Even Donald Maine, the vice president of GTS, testified at trial that he believed in the *Needlyzer* device and saw the effort that Cartelli put forth in making the business venture a success.

LaTouche considered his confronting Cartelli and being provided with verifying documentation as performing his due diligence. It should be noted that neither LaTouche nor Maine had any formal business training prior to engaging in this venture.

Defendant LaTouche acknowledges he made misrepresentations to several investors about the MDD device's patent and FDA approval. However, he wholeheartedly believed Cartelli when Cartelli assured him that the patent issue was a non-issue based upon Cartelli's discussion with Attorney Faber, who advised him that the device could be lawfully marketed overseas. Moreover, obtaining FDA approval would not pose a problem because of the contact Cartelli had with a high ranking member in the federal agency. If FDA approval ever became a problem, Cartelli indicated he could get full approval within 30 days.

The distribution of the monthly newsletters were designed to apprise the investors of the progress the company was making in its marketing efforts overseas. The information that was contained in the newsletters was derived from communications LaTouche had with Cartelli. He (Cartelli) was the only person in the organization who had direct contact with the foreign companies that were being recruited to market the *Needlyzer* overseas. If the information contained in the newsletter was false, it was solely due to Cartelli's deceitfulness and lies, which was unbeknownst to LaTouche.

The Court may be wondering how LaTouche could have been continuously duped by his partner over an extended period of time. However, at one point several leery investors were given the option of having all of their investment monies fully refunded. Not withstanding their concerns, after meeting with Cartelli and listening to his presentation, they too were persuaded by his personality and salesmanship to remain invested in the company. Moreover, several hours of tapes were played during the trial of conversations between

Gaeton Roy (an investor) and Cartelli which establishes the smooth talking style that Cartelli employed when discussing the *Needlyzer* business. This evidence tends to establish that Cartelli was very persuasive in his ability to promote the success of the *Needlyzer* product.

Clearly, LaTouche was unsophisticated in his business dealings with Cartelli and the investors. He desperately wanted to make the investors happy with their decision to invest in his company by securing a large financial windfall for them. The proposed Waste Management deal that Cartelli supposedly negotiated in late '99 appeared to be the vehicle for fulfilling the dreams for all of the parties who had invested. Considering the fact that the time period was the late 90's, when Fortune 500 and technology companies were driving the stock market to unprecedented heights, and the number of millionaires in our country had quadrupled, Mr. LaTouche truly believed the $100 million deal was going to occur. Even Donald Maine testified that he thought his ship was coming in with this deal. LaTouche was so convinced this deal was going to happen that he opened up an account with the name JADS (named for Joe, Al, Don and Sal) on it to place the money into when the deal was finalized. Unfortunately, to keep the "dream" alive, Mr. LaTouche needed the investors to maintain their trust in the project. Without their money for funding, the deal was going to fall through per Cartelli. This is why LaTouche made misrepresentation to Mr. Roy over the telephone about his communication with Attorney Faber, which actually never occurred. His misrepresentations to the investors regarding the *Needlyzer's* patent and FDA approval was clearly criminal, but his intentions were sincere. He wanted the investors to recoup their initial investment along with a sizeable return. Of course, some form of punishment is undoubtedly appropriate concerning the defendant. However, unlike the other 40 investors, LaTouche has lost his entire life's savings, and now he will be branded with a criminal

record for the remainder of his life. The shame of facing his family, friends and co-workers with the label of convicted felon permanently affixed to his name, and knowing that he will die a pauper has an element of punishment already attached to it.

Counsel submits that Mr. LaTouche's case is not within the heartland of the typical mail fraud case. Although his conduct satisfies the statutory elements of mail fraud, it hardly equates to heartland mail fraud. In light of the circumstances surrounding his mailings of the newsletters, a guideline range of 27-33 months is grossly disproportionate to the actual level of his culpability. The unique circumstances of this case were clearly not adequately considered by the Commission when they set a guideline range at such a high level. Accordingly, the defendant respectfully urge that the Court exercise its authority and depart below the applicable guideline range.

## IV.  CONCLUSION

A sentencing court is charged with the responsibility of imposing a sentence that is "sufficient, but not greater than necessary," to accomplish the goals of sentencing. 18 U.S.C. §3553(a). Departures are authorized for the express purpose of addressing unusual circumstances and unusual cases. As the Supreme Court has noted, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human feelings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Koon, 518 U.S. at 113 (1996). The unique circumstances surrounding Mr. LaTouche's conduct in the instant offense, and the reasons set forth in this memorandum, clearly mitigate the seriousness of his conduct and justify a downward departure from the guideline range that would otherwise be applicable. For all of the reasons stated herein, as well as any other grounds that may be asserted at the time of sentencing, the defendant, Albert LaTouche, respectfully requests that the Court depart downward in sentencing him.

Respectfully submitted,
THE DEFENDANT


By: _____
    William H. Paetzold
    Moriarty & Paetzold, LLC
    2230 Main Street
    Glastonbury, CT  06033
    Tel. No. (860) 657-1010
    Federal Bar No: ct10074


**CERTIFICATION**

This is to certify that a copy of the foregoing was mailed to the following parties of record on this 15th day of March, 2005.

Calvin B. Kurimai, Esq.
Assistant U.S. Attorney
157 Church Street
New Haven, CT  06510

Jacqueline Carroll
U.S. Probation Officer
157 Church Street
New Haven, CT  06510

_____
William H. Paetzold