UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | DOCKET NO. 3:03CR182(SRU) |
| | : | |
| v. | : | |
| | : | |
| ALBERT D. LATOUCHE | : | MARCH 10, 2005 |

## GOVERNMENT'S SENTENCING MEMORANDUM

### Background

On June 25, 2003, a grand jury returned an indictment charging the defendant, Albert D.

LaTouche, and his codefendant, Salvatore J. Cartelli, Jr., with nine counts of mail fraud, in

violation of 18 U.S.C. § 1341.  As alleged in the indictment and proven at trial, from March 1997

through July 2000, the defendants engaged in a scheme to defraud forty-six investors,

individually or jointly with their spouses, of $757,000.  The scheme involved making false

representations to investors in Global Telecom Services, LLC ("GTS"), doing business as

Medical Disposal Devices ("MDD"), either to encourage them to invest, or to lull those who had

invested into believing that their investments were safe.

All of the investors were LaTouche's friends, coworkers, or fellow church members, as

well as friends or relatives of the investors LaTouche had solicited.  The events leading up to the

scheme and the offense conduct are set forth at paragraphs 7 through 28 of the presentence report

and will not be repeated in detail herein.  A few facts, however, are important to note.  The first

attempt to market the Needlyzer/Medical Disposal Device from 1993 through approximately

1994 ended in complete failure due, in great part, to the fact that health care organizations would

not purchase the needle disposal device because it was not approved by the U.S. Food and Drug

Administration ("FDA").

Thus, when the market effort was resurrected in December 1996, LaTouche was well aware that its success depended upon FDA approval of the Needlyzer/Medical Disposal Device. LaTouche also was well aware that he, Donald Maine, Cartelli and/or MDD had to acquire the patent or at least a fractional interest in the patent to the device before Dayton T. Brown would consider assembling the device. Finally, LaTouche knew that MDD also had to purchase the parts that Dayton T. Brown would use to assemble the devices.

The patent rights never were acquired; FDA approval was never obtained; not one device was ever assembled, and no parts were ever purchased. However, Cartelli told at least one investor, in LaTouche's presence, that he had forty-one salesmen waiting to begin selling Medical Disposal Devices, and that he had enough parts stored in a warehouse in Florida to assemble 10,000 units. LaTouche falsely told many investors that the device was FDA approved and that he owned the patent. He distributed to potential investors an MDD brochure that had been created by Cartelli and that falsely represented that the Medical Disposal Device had FDA approval. Further he told investors that their money would be used to manufacture the Medical Disposal Device.

LaTouche and Cartelli created newsletters that were mailed to investors from April 1998 through October 1999. Those newsletters falsely represented the progress that MDD was making, including representations that Medical Disposal Devices were actually being built for a company in India. Toward the end of the scheme, LaTouche told potential investors that MDD was being sold to Waste Management for $100 million, and that money was needed to pay the purported sale closing costs.

Cartelli was primarily responsible for the dissipation of the investors' money, as set forth

in paragraph 28 of the presentence report.  There can be no doubt that the lifestyle the investors'

money enabled him to pursue motivated his actions.  However, there would not have been

investors' funds to dissipate if LaTouche had not lied to potential investors to encourage their

investments.

LaTouche's motive was somewhat more subtle than Cartelli's, but nonetheless

compelling.  By August 1996, GTS was not able to meet its overhead expenses with the revenues

it collected from the 900 number advertising business.  Therefore, LaTouche and Donald Maine

borrowed $100,000 from Centerbank, later First Union National Bank, to be used as a cash

infusion into GTS.  Albert LaTouche, his wife, Florence LaTouche, and Donald Maine

personally guaranteed repayment of the loan.  LaTouche and his wife and Donald Maine pledged

their homes as collateral for the loan.  LaTouche and Main agreed that the loan would be repaid

from GTS' income.  In addition, according to the 1996 partnership income tax return of GTS,

LaTouche made a capital contribution of $94,022.  Even with that infusion of capital, GTS had a

net operating loss of $137,553 for calendar year 1996.

It was obvious to LaTouche in late 1996 and early 1997 that the only way he could recoup

his investment and pay off the loan to First Union was to resurrect the Needlyzer marketing

project.  To accomplish that, however, he needed investors.  And so, he lied to potential investors

about owning the patent and about the Needlyzer/Medical Disposal Device having FDA approval

to encourage their investments.  Perhaps the most telling example of LaTouche's motivation was

his energetic solicitation of Scott Brookes' investment.

By December 1998, the $100,000 loan was in default, and the bank accelerated the

indebtedness and made demand for payment.  To avoid the consequences of the demand, on

March 31, 1999, the LaTouches and Maine entered into a forbearance agreement with First Union that called for the payment within thirty days of all past due interest and late charges, and that set a schedule for subsequent payments.

Four days later, on Easter Sunday, LaTouche sat next to Brookes during church service. Later, as they left the church, LaTouche explained that he had a company that was marketing a hypodermic needle disposal device, and that he was accepting a limited number of investors. LaTouche wanted to go directly to Brookes' home to demonstrate the device, but Brookes informed him that he would not be available until that evening. Brookes returned home at approximately 7:30 p.m., and LaTouche called shortly thereafter to arrange to demonstrate the device. LaTouche did so that evening.

LaTouche told Brookes that he had bought the patent to the device and that it would be manufactured outside the United States to avoid FDA restrictions. He also told Brookes that he needed the money then, and that in four to five months he no longer would need investors. LaTouche implied that it was Brookes' chance to get into the project at its beginning. Thereafter, Brookes and his father together invested $30,000. By the time that LaTouche approached Brookes and told him his company was accepting a limited number of investors, LaTouche had received approximately $441,000 from thirty-one investors.

On October 8, 2004, a jury found LaTouche and Cartelli guilty of nine counts of mail fraud, and on October 12, 2004, the same jury found that LaTouche and Cartelli had defrauded the investors into GTS/MDD of $757,000.

**Offense Level Computation**

The Probation Office has computed LaTouche's total offense level using the 1998

Sentencing Guidelines.  The guideline for an 18 U.S.C. § 1341 offense is § 2F1.1, with a base

level of six.  Ten levels have been added because the loss to investors is more than $500,000 but

less than $800,000.  Finally, two levels have been added because the offenses involved more than

minimal planning.  The result is a total offense level of 18.

LaTouche has no prior convictions, so his criminal history category is I.  With an offense

level of 18 in Criminal History Category I, the defendant's guideline imprisonment range is 27 -

33 months.[1]

**Upward Departure**

The Court has advised counsel that it is considering an upward departure pursuant to

U.S.S.G. § 2F1.1, Application Note 11.  The Government believes that such a departure is

appropriate in this case.

"[I]n determining the particular sentence to be imposed, [a court] shall consider (1) the

nature and circumstances of the offense and the history and characteristics of the defendant."  18

U.S.C. § 3553(a)(1).  A sentence should " . . . reflect the seriousness of the offense, . . . promote

respect for the law, and . . . provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).

A court "shall impose a sentence" within the appropriate sentencing guideline range "unless the

court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree,

---

[1]Under *United States v. Booker*, 125 S. Ct. 738 (2005), the Sentencing Guidelines are no longer mandatory.  However, a district court is required to consider Guidelines ranges in imposing sentence.  *Booker*, 125 S. Ct. at 757.  Recommendation in this memorandum for a departure from the defendant's Guidelines imprisonment range should be read in the context of the Sentencing Guidelines being advisory only.

not adequately taken into consideration by the Sentencing Commission . . . ."  18 U.S.C. §

3553(b)(1); *see* U.S.S.G. § 5K2.0.

Under U.S.S.G. § 2F1.1, Application Note 11, a sentencing court may depart upward,

> [i]n cases in which the loss determined under sub-
> section (b)(1) [of § 2F1.1] does not fully capture
> the harmfulness and seriousness of the conduct, an
> upward departure may be warranted.

U.S.S.G. § 2F1.1, Application Note 11.

The Court of Appeals for the Second Circuit has recognized that, while U.S.S.G. § 2F1.1

adequately considers the "kind" of harm that a victim of a fraud scheme may suffer, that is, the

loss of substantial assets, that guideline does not adequately consider the "degree of harm" that a

victim may suffer.  *United States v. Kaye,* 23 F.3d 50, 53 (2d Cir. 1994).  In *Kaye*, the defendant

had been given $893,700 by his great aunt to invest on her behalf.  He did not invest the money

but rather spent it to bolster his failing business and to support an extravagant lifestyle.  The great

aunt recouped only a net of approximately $141,000 from the defendant.  The Second Circuit

affirmed a two-level upward departure imposed by the district court because of the impact of the

fraud on the victim.  *See also United States v. Stouffer,* 986 F.2d 916, 928 n.16 (5th Cir.), *cert.*

*denied*, 510 U.S. 837, 919 (1993)(upward departure appropriate when fraud scheme had a

devastating impact on investors, many of whom lost life savings)(cited favorably in *United States*

*v. Sisti*, 91 F.3d 305, 315 (2d Cir. 1996).

In this case, several of the letters submitted to the Probation Office by investors in

GTS/MDD describe the financial impact of the loss of their investment.  Louis Fabri and his wife

lost $40,000 that had taken over ten years to save, and never will be made up, because of their

ages.  The loss of their $30,000 investment almost forced John and Frances Oktavec into

bankruptcy. (The knowing endangerment of the solvency of one or more victims is one of the examples of bases for an upward departure under U.S.S.G. § 2F1.1, Application Note 11). Robert Fuller lost his entire pension fund that represented twelve years of saving, while Scott and Diane Cartier lost $15,000 that was to be used for their son's college education. Recently, at the sentencing of Salvatore Cartelli, Gaeton Roy advised the Court that the loss of his investment necessitated the recent sale of his home and postponed his retirement seven years. Raymond Kirby, who is permanently disabled, had intended to use the promised return on his investment in GTS/MDD to pay for drugs he is required to take for epilepsy.

In the Government's view, U.S.S.G. § 2F1.1 does not adequately take into consideration the "degree of harm" suffered by several victims in this case, *Kaye*, 23 F.3d at 53, and, therefore, the Government recommends an upward departure pursuant to Application Note 11.

**Defendant's Request for Downward Departure**

**A.  Defendant's Statement of the Background of the Case**

Initially, the Government notes that the chronology the defendant sets forth in the background section of his sentencing memorandum is not correct. *See* Presentence Report, ¶¶ 8-28. The most significant error is the time that the marketing of the Needlyzer first began. That took place in l993, when Brian LaTouche introduced the device to Albert LaTouche. It also was at that time that the defendant enlisted Cartelli in the Needlyzer marketing effort, and Cartelli, in turn, recruited Joseph Scafidi. Brian LaTouche's access to Needlyzers was through Robert Hall, who had the right to manufacture the devices. The Hall-Brian LaTouche relationship ended in April 1994, and, therefore, defendant LaTouche no longer had access to Needlyzers.

Further, by November 1994, it was plain that FDA approval would not be forthcoming in

the foreseeable future and the Needlyzer marketing effort was abandoned.  It was later, in

November 1995, that Brian LaTouche introduced his brother to the 900 number advertising

business, and later still, in later December 1996, that LaTouche and Cartelli decided to resurrect

the Needlyzer project.

The significance of the sequence of events is that from December 1996 through July

2000, the defendants did not have access to Needlyzers, even if they had an interested customer,

and they well knew that the device was not FDA approved.

Also, after the Needlyzer marketing project was abandoned in November 1994, Joseph

Scafidi returned to his employment in Long Island, New York.  By 1997, when he was

approached by Cartelli and LaTouche, he was vice president in charge of manufacturing at the

Dayton T. Brown Company.  When Scafidi met with LaTouche, Cartelli and Maine at Dayton T.

Brown in the summer of l997, he told them that the company did have the capacity to assemble

Needlyzers/Medical Disposal Devices.

Scafidi also told them that the president of Dayton T. Brown would not even consider

such a venture unless three conditions were met: GTS/MDD, or LaTouche or Cartelli, owned the

patent to the device outright or held a fractional interest in the patent; the device had FDA

approval; and GTS had purchased the parts required to assemble the devices.  Thus, when

LaTouche reported in two newsletters that Needlyzers/Medical Disposal Devices were being

manufactured for a buyer in India, he knew those statements were not true because the three

conditions precedent to the assembly of the device plainly had not been met.

### B. Defendant's Objection to the More-than-Minimal-Planning Adjustment

LaTouche objects to the two-level increase in his total offense level for more than

minimal planning. He bases his objection upon his contentions that he had no knowledge of the

falsehoods contained in the newsletters, and that he had not schemed with Cartelli to defraud

investors. Those contentions were rejected by the jury in its finding of guilty on all counts

charged in the indictment.

"'More than minimal planning' is deemed present in any case involving repeated acts

over a period of time, unless it is clear that each instance was purely opportune." U.S.S.G. §

1B1.1, Application Note 1(F); U.S.S.G. § 2F1.1(b)(2). LaTouche's conduct in repeatedly

making false representations to investors, orally and in the newsletters, was the antithesis of acts

that were "purely opportune", and the Probation Office correctly enhanced LaTouche's offense

level by two points for more than minimal planning.

### C. Age of the Defendant

While not ordinarily relevant to a departure determination, "[a]ge may be a reason to

impose a sentence below the applicable guideline range when the defendant is elderly and infirm

. . . ." U.S.S.G. § 5H1.1. Similarly, a defendant's physical condition also is not ordinarily

relevant, although "an extraordinary physical impairment" may support a departure. U.S.S.G. §

5H1.4. Where the Guidelines discourage departure on the basis of a factor, such as age,

departure is warranted "only if the factor is present to an exceptional degree" *Koon*, 518 U.S. at

96. Courts have granted departures where a defendant's age and medical condition make

incarceration unnecessarily life threatening, *see United States v. Gigante*, 989 F.Supp. 436, 442-

443 (E.D.N.Y. 1998)(collecting case). This is not such a case. Plainly LaTouche's age and physical condition do not call for a downward departure.

The fact that a significant period of incarceration at his age will doubtless diminish his ability to make restitution is an unfortunate by-product of sentencing in fraud cases. As a practical matter, however, with a yearly gross income of $53,000, it would take the defendant between fifteen and twenty years to repay the people he defrauded, and that assumes his entire yearly net income would be used for that purpose. Further, the defendant cites no support for his statement that "most of the investors would rather get their money back than have the defendant go off to jail." In the Government's view, a restitution order will accomplish all that realistically can be accomplished to achieve partial repayment to the investors.

**D. Length of Time Until Defendant's First Conviction**

LaTouche seeks a downward departure because he led a crime-free life until he was approximately 60 years old. In support of that request, he cites one district court case from the Eastern District of Virginia. The Government is unaware of any decisions by the Second Circuit affirming such a departure, and, therefore, the defendant's request should be denied.

**E. Voluntary Disclosure of Offense**

The defendant contends that a "significant portion of the evidence [in this case] would not have been discovered by the government had the defendant not voluntarily provided it to them." The defendant's contention is not correct. The Federal Bureau of Investigation ("FBI") received the initial investor complaint from Anthony DiLauro on October 6, 2000. Between October 23, 2000 and December 1, 2000, the FBI case agent, Russell Brown, interviewed Anthony and Sharon DiLauro, John and Frances Oktavec, Mark Epright, Robert Nettleton, Scott Brookes,

Gaeton and Rose Marie Roy, John Durinick and Louis Fabri. Each provided Special Agent Brown with documents he had received from LaTouche, including newsletters, investor agreements and personal cancelled checks or copies of bank checks by which each had made his investment. Also, between November 1, 2000 and December 20, 2000, grand jury subpoenas were served on four banks associated with GTS.

Donald Maine was interviewed on March 22, 2001, and on April 2, 2001, Attorney Paetzold accepted service of a subpoena for the business records of GTS/MDD. Many of the documents used to continue the investigation, and many that were subsequently introduced at trial were produced pursuant to the GTS/MDD subpoena.

The investigation of LaTouche and Cartelli was well underway by the time LaTouche met with Special Agent Brown and undersigned Government counsel on May 10, 2001, and, during that meeting, LaTouche did not admit to the misrepresentations he had made to investors. In the Government's view, aside from providing the records pursuant to the subpoena, which LaTouche was required to do, he provided nothing of substance to further the investigation.

As for his truthful admissions at trial, LaTouche's only options were to tell the truth or commit perjury. And, while he told the truth about that which already had been proven in the Government's case, he maintained that he relied upon and was misled by the information given to him by Cartelli, an assertion which the Government does not believe.

The defendant should not receive credit for his supposed cooperation.

### F. Defendant's Conduct Is Not a "Heartland" Mail Fraud Case

LaTouche's contentions in support of his claim that his conduct is not a heartland mail fraud case essentially mirror his testimony at trial. That testimony did not persuade the jury, nor should his contentions on this issue now persuade this Court.

-11-

**Conclusion**

      For all the reasons set forth above, LaTouche's motion for a downward departure should

be denied, and the Government urges the Court to depart upward in this case pursuant to

U.S.S.G. § 2F1.1, Application Note 11.

                              Respectfully submitted,

                              KEVIN J. O'CONNOR
                              UNITED STATES ATTORNEY

                              CALVIN B. KURIMAI
                              ASSISTANT UNITED STATES ATTORNEY
                              FEDERAL BAR NO.  ct07223
                              157 CHURCH STREET
                              NEW HAVEN, CONNECTICUT 06510
                              (203) 821-3700

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served by Facsimile and mailed to the following counsel of record on this 10th day of March, 2005, to:

> William H. Paetzold, Esq.
>  Moriarty & Paetzold-Gstnby
> 2230 Main Street
> Glastonbury, CT   06033
> (860) 657-1011

_____
CALVIN B. KURIMAI
ASSISTANT UNITED STATES ATTORNEY