UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED
2005 MAR -9 P 12: 44
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| vs. | : CASE NUMBER 3:03 CR 182 (SRU) |
| ALBERT LATOUCHE | : MARCH 12, 2005 |

### NOTICE OF MANUAL FILING

Please take notice that the Defendant, Albert LaTouche, has manually filed the following documents:

CFI Investigative Report dated AUGUST 17, 2000

FBI 302 Report of Albert LaTouche dated May 16, 2001

This memorandum or exhibit has not been filed electronically because

[X]   The document cannot be converted to an electronic format

[ ]   The electronic file size of the document exceeds 1.5 megabytes

[ ]   The document or thing is filed under seal pursuant to Local Rule of Civil Procedure 5(d) or Local Rule of Criminal Procedure 57(d)

[ ]   Plaintiff/Defendant is excused from filing this document or thing by Court order.

The document or thing has been manually served on all parties.

Respectfully submitted,
THE DEFENDANT

By: _____
William H. Paetzold
Moriarty & Paetzold, LLC
2230 Main Street
Glastonbury, CT  06033
Tel. No. (860) 657-1010
Federal Bar No: ct10074

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed to the following parties of record on this 15th day of March, 2005.

Calvin B. Kurimai, Esq.
Assistant U.S. Attorney
157 Church Street
New Haven, CT 06510

Jacqueline Carroll
U.S. Probation Officer
157 Church Street
New Haven, CT 06510

_____
William H. Paetzold

EXHIBIT A

## CFI Associates, L.L.C.
### Private Investigators
### Certified Fraud Examiners
*Investigative Report*
*Privileged and Confidential*

Page 1-8

---

**Case Name:** *Albert LaTouche*                    **Date:** *August 17, 2000*

**Investigator:** *D. D. Saccente, CFE*

**Referred By:** *Attorney William Piedzol*

**Client Information:** *Albert LaTouche*           **Suspect:** *Sal J. Cartelli, Jr.*
*427 Candlewood Hill*                               *230 Shore Road*
*Higganum, CT*                                      *Old Lyme, CT 06371*
*(860) 345-2012*                                    *(888) 881-3477*

**Business Entity:** *Medical Disposal Devices*     *Global Telecom*
*230 Shore Rd.*
*Old Lyme CT 06371*

---

**Case Synopsis:**

On August 17, 2000, Albert LaTouche requested that a representative from CFI Associates be present at his home in Higganum, CT between the hours of 12:00 p.m. and 1:00 p.m. The purpose for this presence was to listen to a telephone conversation over a speakerphone and take notes regarding what was said between Mr. LaTouche and Sal J. Cartelli.

On this date at approximately 11:30 a.m., I (D.D. Saccente) met with Mr. Albert LaTouche and Donald Maine. This meeting took place at Mr. Latouche's residence located at 527 Candlewood Hill Rd., Higganum Connecticut. Mr. LaTouche explained that sometime during 1996, he contacted Mr. Cartelli and asked advise regarding a potential business opportunity. Mr. LaTouche stated that he is and has been a dispatcher for a trucking company for the past 30 years and has very little knowledge about setting up and operating a business. He stated that he has known Mr. Cartelli for many years and that he believed that Mr. Cartelli was a very successful businessman and thought he could help.

CFI Associates, L.L.C.
Private Investigators
Certified Fraud Examiners
*Investigative Report*
*Privileged and Confidential*

Page 2-8

Mr. LaTouche explained that sometime during 1996 his brother told him about a business opportunity involving the manufacture and sale of a medical waste disposal device known as the "Needleizer." This device would potentially be used by physicians, hospitals and laboratories to dispose of hypodermic needles. According Mr. LaTouche the device burns the needles eliminating any hazards.

Mr. LaTouche went on to state that he and a friend by the name of Donald Maine of Higganum, CT were looking for an opportunity to go into business and make a profit that would allow them to enhance their retirement. Mr. LaTouche stated that he initially approached Mr. Cartelli with the idea of manufacturing and selling the devices in 1996. According to Mr. LaTouche, Mr. Cartelli expressed interest in going into business with Mr. LaTouche. Mr. Cartelli stated that he would set aside $350,000.00 of his own funds to help develop the company. He also offered office space for a monthly rental fee to Mr. Cartelli in one of the buildings owned by him.

According to Mr. LaTouche, it was agreed between Mr. Cartelli, Mr. Donald Maine and himself that Mr. Cartelli would handle all activities involving the organization and development of the building. Mr. Cartelli would investigate patent and trademark issues, handle all financial activities of company and basically manage, direct and operate the company. Mr. Cartelli would receive a portion of the profits for his efforts.

During this period Mr. LaTouche and Mr. Maine were also considering opening a business involving the sale of 900 telephone numbers. Mr. LaTouche explained that although his main interest was to manufacture and sell the "Needleizer" he and Dan began Global Telecom a company that sold 900 numbers. He stated that both Global and MDD were located in Mr. Cartelli's office.

Mr. LaTouche stated that Mr. Cartelli recommended that the a company known as Global Telecomm (phone service) be a limited liability company with another company Medical Disposal Devices (MDD) (Needleizer" being a dba of Global Telecom. Pursuant to Mr. Cartelli's suggestion the recommended business structures were filed with the Connecticut Secretary of States Office.

CFI Associates, L.L.C.
Private Investigators
Certified Fraud Examiners
*Investigative Report*
*Privileged and Confidential*

Page 3-8

---

Mr. LaTouche reported that Global and MDD open a checking account with Donald Maine, Sal J. Cartelli, Jr. and woman known as Marybeth Mackein (Mr. Cartelli's girlfriend) as signatories on the account. This account was with the Fleet Bank, Higganum, CT. The startup capital for the company was minimal. The balance of this account was ultimately transferred to a Fleet Bank account in Old Lyme, CT in the name of Global Telecom. He stated that he and Mr. Maine initially developed and operated Global from this office while Mr. Cartelli concentrated on researching, promoting and developing MDD. While in this office Mr. LaTouche would have limited access to the company checking account so that he and Mr. Maine could be paid a salary. On those occasions Mr. LaTouche would draft and sign the checks.

According to Mr. LaTouche, there came a time when Mr. Maine, Mr. Cartelli and himself spent most of their time concentrating on MDD. He stated that during this period Mr. Cartelli took sole responsibility for all disbursements and in fact had full control of the company account.

Mr. LaTouche stated that Mr. Cartelli represented to him MDD was developing to be a lucrative project. He stated that Mr. Cartelli provided him with numerous documents indicating such things as the hiring of a New York law firm to research patent and trademark filings, promoting the business and acquiring potential buyers. During this period of time, Mr. Cartelli reported that more money was needed to fund this project. He suggested that Donald Maine and Mr. LaTouche get SBA loans and acquire more investors to fund this project. Pursuant to Mr. Cartelli's representations both Donald Maine and Mr. LaTouche applied for SBA loans and promoted the company to their friends and relatives. Mr. LaTouche reported that he and Mr. Maine acquired over $1 million dollars to fund the project. He stated that all money received was transferred to the business account to be disbursed by Mr. Cartelli. According to Mr. LaTouche, there came a time when Mr. Cartelli suggested that all funds be placed into an account in the name of Cartelli and Cartelli.

CFI Associates, L.L.C.
Private Investigators
Certified Fraud Examiners
*Investigative Report*
*Privileged and Confidential*
Page 4-8

Mr. LaTouche reported that in most cases investor funds went directly into a checking into the business account. On a few occasions Mr. LaTouche cashed these checks at his bank and gave the cash to Mr. Cartelli. He explained that this was done pursuant Mr. Cartelli's directions because depositing the checks into the company took too long to clear.

According to Mr. LaTouche, he and Mr. Maine received very little money from the investor funds. He stated that the company did lease him a Lincoln Town car. According to Mr. LaTouche, Mr. Cartelli took on the responsibility of paying the car lease, insurance and the SBA loans.

Mr. Cartelli represented to Mr. LaTouche that the "Needleizer" was being examined by someone by the name of Lucas employed by the FDA. He stated that Mr. Cartelli represented that Lucas stated that all the paperwork was in and that it was imminent that FDA was going to approve the sale of this device.

In addition, Mr. LaTouche stated that Mr. Cartelli reported that he had several prospects for the purchase of the company. He stated that a member of the Gandhi family was interested. Most recently Mr. Cartelli represented that there is a purchase agreement pending in which a Chinese Nationalist by the name of Mr. Lue was going to purchase the company for $100 million dollars.

As of the date of this report, Mr. LaTouche stated that Mr. Cartelli has expended all funds and there are no funds left in any business account nor has a purchase taken place. He stated that all he has is Mr. Cartelli's word that Mr. Lue of China was going to purchase MDD and the "Needleizer" within the next few weeks for $100 million dollars.

Mr. LaTouche further reported that most of the investors consisting of friends and relatives were anxious for their money and an accounting of how their money was invested. He stated that he has tried to meet with Mr. Cartelli in person and acquire business records an accounting of the business but Mr., Cartelli has refused to meet with him. According to Mr. Cartelli, he is being treated for cancer at the Walter Reed Hospital. Mr. Cartelli further stated that he didn't want anyone to see him in his condition and that communications with people outside the hospital were limited.

CFI Associates, L.L.C.
Private Investigators
Certified Fraud Examiners
*Investigative Report*
*Privileged and Confidential*

Page 5-8

Mr. LaTouche stated that he contacted the Walter Reed Hospital and inquired if Mr. Cartelli was a patient and they informed him that there was no patient in the hospital by the name of Cartelli.

Although Mr. LaTouche felt Mr. Cartelli was being untruthful, he explained that it was possible that no information was being given out because Mr. Cartelli was a CIA agent. He stated that on one occasion he (Mr. LaTouche) questioned Mr. Cartelli's credibility. On this occasion, Mr. LaTouche, his wife, adult son and Donald Maine went to see Mr. Cartelli. According the above-mentioned people Mr. Cartelli showed them a badge representing that he was a CIA agent. Mr. Cartelli is then reported to lift up his jacket show them a revolver. Mr. Cartelli warned them not tell anyone about him being a CIA agent and if they did he would have to kill them.

Based on the above information it appears that Mr. LaTouche, his family Donald Maine and other investors could be victims of a scheme to defraud them. Mr. LaTouche advised his attorney that Mr. Cartelli has been in constant contact with him via the telephone updating him about the MDD sale. I was asked to be present to listen to a telephone conversation which was to take place on August 18, 2000 between the hours of 12:00 noon and 1:00 p.m.. This phone call was to originate from Walter Reed Hospital with Mr. Cartelli making the representations to Mr. Cartelli.

ACTION TAKEN:

On Thursday, August 18, 2000, I was present at Mr. La Touche's residence located at 579 Candle Wood Hill, Higganum, Connecticut. On this date, at approximately 12:40 p.m. a telephone call was received on Mr. LaTouche's telephone (860)345-2012. Present to witness this telephone call was Donald Maine, Mrs. LaTouche, their son and myself. Upon answering the telephone, Mr. LaTouche immediately advised the caller whom he addressed as Sal that he was speakerphone so that everybody in the room could hear the conversation. The caller authorized the conversation to go over the speakerphone.

The caller who answered to the name of Sal was identified by all parties present to be Mr. Salvatore Cartelli Jr. Sal stated that he was in the hospital and that he had tried to contact Mr. LaTouche earlier in the day but the hospital limited his access to the pay phone.

**CFI Associates, L.L.C.**
Private Investigators
Certified Fraud Examiners
*Investigative Report*
<u>*Privileged and Confidential*</u>

Page 6-8

Sal stated that he had contacted the IRS but no one was available and thought that it was good idea not leave a message. He stated that he was unable to make contact with Roxanne or Lucas.

Sal stated that there was no problem with Mr. Lue and that Mr. Lue was sending $750,000 to make the deal work. He stated that once this money was received this would "clinch the deal."

He stated that he had been in contact with Lucas and the last thing Lucas of the FDA stated was that all the paperwork was going through the system and that it would take about 30 days. He also stated that he tried to contact Attorney faber but was unable to speak with him. According to Mr. LaTouche, Atty. Farber is a New York attorney handling the patent and trademark issues regarding the "Needleizer."

Mr. LaTouche suggested that since Sal was having problems with reaching Lucas, Roxanne and Attorney Farber regarding the MDD venture maybe he (Mr. LaTouche) could speak with them. Sal responded that no one knows about Mr. LaTouche or anyone else regarding this venture. He stated that all individuals believe that the only one involved was himself (Sal) therefore no one will talk to Mr. LaTouche. Sal then stated that he wished others took part in the deal and that he was the "Lone Ranger."

Sal went on to state that Roxanne had contacted him and that she reported that someone had tried to break into the MDD office. He stated that he was concerned for Roxanne's safety. He stated that the attempted break was reported to the police and that there was witness. He stated that this witness saw a white male with a beard on a motorcycle attempt to break in. Sal stated that he though that it might be one the investors. He stated that this occurred because the investors never received any information about the venture, newsletters or anything else.

Sal stated that he had an individual by the name of Scott Grafiano(phonetically spelled) arrested because he caused a scene asking for his money. Sal stated that everything was going smooth with the venture and believed that it would conclude within one to two months. He stated that the investors didn't realize how big this venture was and mentioned that it was worth $100 million dollars.

CFI Associates, L.L.C.
Private Investigators
Certified Fraud Examiners
*Investigative Report*
*Privileged and Confidential*

Page 7-8

Sal stated that he went through the same thing with Hurst and look what happened there. He stated Hurst "brought us to court and nothing happened." He stated that the percentage of money that investors gave was small in relation to what they were going to get back. He stated that no court or judge would award more money than what the investors received from the venture and that would put everybody "to sleep."

Sal stated that when this deal was completed "we will receive $10 million each. He stated that this was after taking money for the charity.

Mr. LaTouche told Sal that he was receiving calls from the investors and asked Sal what should he tell them. Sal responded that "don't tell them anything." He stated that the investors should have known the risks with investing. Sal stated that there are no guarantees. He stated when someone invests in stocks, the stocks could go down in three months and then three months later go up. Those are the chances they take. He stated that "they are not entitled to anything by law."

Mr. LaTouche told Sal that "Gator" had contacted him and threatened that if he doesn't get $100,000 by the end of the day, he would have his attorney contact the U.S. Attorney. Mr. LaTouche stated that he was concerned about being arrested. Sal responded that Mr. LaTouche should not worry. He told Mr. LaTouche to tell "Gator" 'Do what you have to do. It's a shame that this will end a friendship."

Sal advised Mr. LaTouche not to worry about being arrested. He stated that it wasn't easy to get someone arrested. He stated they would have to go to their attorney, who then goes to the US Attorney, then to the State Attorney, then to the state and federal court. He stated that these things take time and that it would take more than 60 days and by then the deal will be completed.

Sal then went on to state that he has to deal with the "IRS guy" and that he had "two bills to pay totaling 100" He stated that the bills were due by the 22nd. He stated that he would take care of this problem by issuing them a check from the MDD checking account. He stated that he knew that this account did not have any money in it but the check would stall the IRS.

Sal then stated that the SBA payments were due by the 25th and that he would do the same thing and issue checks from the MDD checking account to stall for time.

CFI Associates, L.L.C.
Private Investigators
Certified Fraud Examiners
*Investigative Report*
*Privileged and Confidential*

Page 8-8

Mr. LaTouche told Sal that he could not explain to the investors what happened to their money since he (Sal) handled the funds. Sal responded that he would write a letter detailing where the money was spent and what has transpired. He asked Mr. LaTouche if that would help him. Sal stated that he would send this letter within the week. Sal stated that every dollar was accounted for.

Sal stated that he would have to fudge this report so that nothing was mentioned about the Town car but advised Mr. LaTouche that it was legitimate expense since it was company car. He stated that he was going to pay the car lease this month in the same way he was going to take of the IRS and SBA.

Sal ended the conversation at approximately 1:15p.m. Mr. LaTouche had a caller ID monitor on the telephone used for this conversation but upon examining it, the words private number were displayed.

EXHIBIT B

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription  05/16/2001

Albert D. Latouche, born November 5, 1936, Social Security Account Number 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, 427 Candlewood Hill Road, Higganum, Connecticut, 06441, telephone number (860) 345-2012 was interviewed regarding Medical Disposal Devices. Also present during the interview were Latouche's legal counsel, William H. Paetzold, Esq., Latouche's Private Investigator, D. Saccente, and Assistant United States Attorney, Calvin Kurimai. Kurimai presented Latouche with a Proffer Agreement, which Latouche signed after reviewing the document with his attorney. Kurimai also instructed Latouche not to provide specific dates of events unless he was certain. Latouche could return another day when he had refreshed his memory regarding specific event dates. After being advised of the identity of the interviewing agent and the nature of the interview, Latouche provided the following:

Latouche is currently employed full time as an Oil Distributor Dispatcher for Automatic TLC Oil Company, 64 Oakland Avenue, East Hartford, Connecticut. Latouche has been an Oil Distributor Dispatcher since 1955 and previous to his current employer was employed by Atlas Oil Company.

In the early 1990s, Latouche's brother, who lives in Tennessee was conducting business in the "900" pay for service telephone numbers and introduced Latouche to the business. During the years 1993 and 1994, Latouche set up a "900" telephone number which he personally purchased and the number then was serviced by his brother's business. Latouche's "900" number, when dialed, would reach Latouche's brother's business and be routed to an appropriate operator on duty. Latouche described his "900" number as a "dating line" or "sex talk line." Latouche's business was named "Fantasy Exchange." Latouche would advertise the number and service across the country and shared the caller revenue with his brother. Latouche's "Fantasy Exchange" lasted for a short period of time after advertising costs where larger than revenues received from callers.

Latouche's brother introduced Latouche to the Needlyzer, a device which destroyed hypodermic needles. Latouche's brother was introduced to the device by another individual, Bob Hall from Tennessee. Latouche's brother wanted Latouche to handle marketing

---

Investigation on  5/10/2001  at  New Haven, Connecticut

File #  196D-NH-40566  Date dictated  5/15/2001

by  SA Russell H. Brown

AL-05-10.WPD

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

196D-NH-40566

Continuation of FD-302 of __Albert D. Latouche__, On __5/10/2001__, Page __2__

the device in the Northeast Region. Latouche's brother sent Latouche letters from establishments interested in the device. Two of the letters were from the University of Arizona and the University of Florida describing their interest in the device and the potential of the device for the medical industry. Latouche's brother also sent Latouche one of the devices to help Latouche's marketing efforts.

During the years of 1993 and 1994, Latouche brought the device to the pharmaceutical company, Pfizer. Latouche talked with an individual, who's name he does not recall. Pfizer bought three devices. Latouche contacted his brother and stated he had sold three units to Pfizer and Latouche's brother shipped the three units. Latouche's brother and Hall were excited about the sale.

Latouche knew an individual, Salvatore Cartelli, for many years. Latouche believed Cartelli was a good salesman and believed Cartelli could market the device. Cartelli had operated several gasoline service stations, which had gone out of business due to storage tank leakage and subsequent clean up costs.

During the summer of 1994, Latouche approached Cartelli at Cartelli's office building located at 307 Main Street, Cromwell, Connecticut. Latouche talked with Cartelli extensively about the Needlyzer and the possibility of Cartelli helping market the device. Cartelli stated he had medical contacts and thought he could market the device. Cartelli worked for Latouche as a salesman. The business organization agreement was for Cartelli to acquire sales orders, provide the orders to Latouche, Latouche would provide the orders to Latouche's brother, and Latouche's brother would order the devices from Hall. Hall would be responsible for manufacturing the device units. At this time, Latouche and his wife were operating a business named Health Smart and the Needlyzer business would be conducted through this company. Latouche's brother told Latouche the patent for the device was held by two men from Rhode Island named Bill Kirk and an individual with the last name of Lockett. Over the next year, Cartelli told Latouche that Cartelli had many leads of companies, including a hospital in Greenwich, Connecticut, which were interested in purchasing the device. Cartelli told Latouche that Pfizer, the same company which had previously purchased three devices, was now interested in purchasing an additional 2,000 device units. Cartelli informed Latouche that Cartelli had a network to market the device all over the country and in Mexico. Cartelli had multimillion dollar "things" from Mexico.

196D-NH-40566

Continuation of FD-302 of  Albert D. Latouche  , On  5/10/2001  , Page  3

Over a period of time, Latouche was unable to acquire any more sales of the Needlyzer units. Hall notified Latouche's brother that Hall was no longer going to conduct business with Latouche's brother. Latouche's brother had $250,000.00 invested and sued Hall for breaking the agreement. Latouche's brother received a judgement, but Latouche did not know any details about the judgement.

During 1995, Latouche's brother approached Latouche about another business venture involving "900" pay for service telephone numbers. Latouche's brother would provide telephone numbers of individuals who were interested in purchasing "900" telephone numbers. Latouche's brother acquired the lists of individuals from a company called Espri (ph) and then provided the lists to Latouche. Latouche would receive $25.00 for each individual he successfully contracted to purchase a "900" telephone number, regardless of the type of service the person was purchasing.

During approximately November, 1995, Latouche was a full time employee and did not have much time to devote to his brother's business offer. Latouche approached Donald Maine, a retired United States Postal Service employee, to help Latouche with the sale of "900" telephone numbers. Latouche had met Maine through a common participation in a Horseshoe League. While attending a Horseshoe League event in Tennessee, Latouche and Maine traveled to meet with Latouche's brother and discuss the business proposition. After having met with Latouche's brother, Latouche and Maine agreed to form a business together and run the business out of Maine's house. Latouche's Daughter-In-Law agreed to work a couple of hours a day for Latouche and Maine. Shortly after they agreed to go into business together, Maine informed Latouche that Maine's basement was not going to work well for the computer equipment.

Latouche contacted Cartelli and asked him about possible available office space to rent. Cartelli did not have space available in Cromwell, Connecticut, but he was renting office space in Old Lyme, Connecticut and Cartelli did have space there to rent. Latouche and Maine could rent and share office space with Cartelli in Old Lyme, Connecticut.

In early 1996, approximately January, 1996 Latouche and Maine agreed to rent a portion of Cartelli's office space in Old Lyme, Connecticut and Latouche registered Global Telecom Services (GTS) with his and Maine's names. Cartelli informed Latouche and Maine that Cartelli owed $1500.00 in overdue rent. Maine took a

196D-NH-40566

Continuation of FD-302 of __Albert D. Latouche__ , On 5/10/2001 , Page 4

cash advance from his credit card and paid the rent amount owed. The rent for the office space was $700 to $900 per month. Latouche opened a bank checking account for GTS at Moodus Savings Bank, Moodus, Connecticut. Latouche wrote most of the checks for the company's financial responsibilities.

Cartelli informed Latouche that Cartelli had continued to try to market the Needlyzer device since they had last conducted business together. Cartelli now had an individual named Joseph Scafidi helping market the device. Scafidi was a long time friend of Cartelli's and a retired employee of Dayton Brown Manufacturing, Long Island, New York.

Cartelli suggested Latouche, Maine, Scafidi, and Cartelli work as partners. They maintained a verbal business agreement. There would be two businesses running out of the office space. One business would be the Global Telecom Services (GTS) "900" number business and the other business would focus on marketing the Needlyzer. Cartelli told Latouche that the Needlyzer device would be easier to market and sell if a different name was used to market and sell the device. Cartelli created the name Medical Disposal Devices (MDD) and was going to refer to the Needlyzer as the Medical Disposal Devices device. Cartelli suggested that the MDD business operate under the GTS business name. Therefor Global Telecom Services would be Doing Business As (DBA) Medical Disposal Devices. Cartelli stated the business partnership had to be verbal since Cartelli was in the process of a divorce and any legal agreements would have to be turned over during his divorce proceedings. Cartelli, Latouche, and Maine formed a verbal business operations agreement. The responsibilities were for Maine to work as the salesman for the "900" telephone numbers, Latouche to continue his full time employment and assist GTS/MDD when he was available, and for Cartelli to maintain the entire GTS/MDD businesses and handle all of the financial operations, due to his knowledge of operating businesses. Cartelli would also bring in his girlfriend, Mary Beth Mackin, who was experienced in the advertising business. Mackin would handle advertising for the businesses.

After a couple of months of the GTS/MDD partnership, Latouche turned the company's checkbook over to Cartelli. Cartelli told Latouche that Cartelli had trouble clearing checks at the Moodus Bank, so the account was canceled. Cartelli opened an account for GTS/MDD at Fleet Bank utilizing the GTS and newly created Medical Disposal Devices name.

196D-NH-40566

Continuation of FD-302 of __Albert D. Latouche__, On __5/10/2001__, Page __5__

    Cartelli convinced Maine that GTS/MDD needed to rent more office space. Cartelli stated he had investors who had seen the office space and then decided not to invest in MDD. Cartelli signed a two year lease agreement for GTS/MDD to rent the office space above the existing office space located at 230 Shore Road, Old Lyme, for $2600.00 per month. Cartelli informed Latouche and Maine that GTS could end up having several hundred accounts. Cartelli knew the landlord and Latouche did not know of the agreement until several days after Cartelli signed the lease agreement. Cartelli told Latouche the company needed space for employees who were going to work with Mackin to generate advertising, which in turn would produce customers. Latouche stated the revenue raised from sales, created by the advertising, would be revenue for the company. Latouche stated the company received no revenue after the $25.00 commission from each sale of each "900" telephone number.

    Cartelli hired four woman to assist Mackin with advertising. Advertisements were placed in magazines and newspapers to solicit clients for the 900 telephone numbers. Cartelli hired one woman, Loraine Pnucci to work solely on the Needlyzer/MDD marketing with Cartelli.

    In late 1996, Cartelli was continuing to market the device. Cartelli, Mackin, Scafidi contacted patent attorney Bob Faber who was located in New York. Faber was retained regarding the proof of patent rights of the Needlyzer device. Cartelli had discussions with Kirk and Lockett regarding the Needlyzer. Cartelli told Latouche no one could prove who owned the rights to the device and Latouche agreed to send $5,000.00 to Kirk and Lockett's attorney to continue researching the device's patent rights.

    Cartelli told Latouche that Cartelli was in charge of his Aunt Minni & Uncle Jim's trust in Middletown, Connecticut and was looking for good business investments. Cartelli told Latouche that Cartelli had $350,000.00 from the trust to invest into the Needlyzer marketing and sales. Cartelli would use the trust money to purchase the rights to the device. Cartelli informed Latouche that Cartelli knew individuals in China and an individual who personally knew the Pope and these individuals would help market the device.

    Cartelli informed Latouche that Cartelli was a Vietnam War Veteran, a CIA Special Agent, and if Latouche told anyone this information, Cartelli would have to kill Latouche. Cartelli also

196D-NH-40566

Continuation of FD-302 of __Albert D. Latouche__ , On __5/10/2001__ , Page __6__

displayed a badge and on numerous occasions displayed a holstered pistol.

    The GTS "900" telephone number business ended sometime in late 1996, but Latouche was unsure of time frame. The business was not producing enough revenue.

    Latouche met an individual introduced to him by Cartelli as a person who personally knew the Pope. The individual stated the Pope would be very impressed with the device. Cartelli stated there were orders and money coming from India for purchasing device units. At one point in time, Cartelli had Latouche and Maine traveled to Guatemala to demonstrate the device to a hospital.

    Cartelli stated to Latouche that the company was very close to marketing and selling large quantities of the device. Cartelli told Latouche that they can not let the business end. Cartelli requested more money from Latouche. Cartelli showed documents from India and the Pope to support Cartelli's view of the business. Latouche and Maine applied for and received a small business loan to support GTS/MDD.

    After a period of time, Cartelli again informed Latouche that the business needed more money. Latouche never questioned where the money was being spent. Cartelli had complete control of the GTS/MDD finances. Latouche informed Cartelli that Latouche may have some friends who may be interested in investing, since Latouche no longer had any money to invest into GTS/MDD.

    Latouche informed Gaetan and Rose Roy of the possibility of investing in MDD and the device. The Roys traveled to the GTS/MDD office and Cartelli demonstrated the device to the Roys. The Roys signed an an investment agreement with Latouche, Maine, and MDD. On another occasion Mrs Miceli and her husband were interested about investing in MDD and the device. They too traveled to the office and received a demonstration given by Cartelli and subsequently invested in MDD.

    Cartelli and Maine created the various investment and loan agreements, but Latouche and Maine signed all of the agreements. On occasions, Latouche traveled to potential investor's homes and demonstrated the device. Latouche showed the potential investors the documents from the Pope, India, provided the MDD sales brochure, and stated the device was patented and approved by the Federal Drug Administration (FDA). Latouche

196D-NH-40566

Continuation of FD-302 of __Albert D. Latouche__ , On __5/10/2001__ , Page __7__

provided investors with agreements which had already been endorsed by Maine. Latouche did not know why the investment agreements changed over time, but did not approve of the first agreements which stipulated investors receive a repayment of their investments by a specific date.

Cartelli told Latouche that Faber had stated there was no clear ownership of rights to the device and MDD should move forward and sell the device. Cartelli told Latouche that he had spoken to and individual named John Locus at the Food and Drug Administration (FDA) and MDD could receive FDA approval in thirty days upon request from MDD. When Latouche had initially attempted to market the Needlyzer, Latouche's brother had informed Latouche that the Needlyzer device had received FDA PMA approval. Latouche stated PMA approval was a preliminary approval from the FDA to initiate marketing and selling the device.

Since Cartelli was in control of all financial matters, Latouche believed Cartelli was paying the Small Business Loan which Latouche had received for the GTS/MDD business. Latouche did not know the loan was in arrears until Latouche received a "drastic" notice from the bank regarding the loan. Cartelli kept information from Latouche. Cartelli stated he had been mistakenly sending loan payments to South Carolina. The overdue payments and money due for the Small Business Loan took over two years time for Latouche to correct.

Cartelli constantly put pressure on Latouche for Latouche to raise more money. Cartelli needed money for company costs. At times Cartelli requested Latouche exchange the investor checks for cash and then provide Cartelli with the cash. Cartelli stated that the funds from the checks took too long to become available. At times MDD needed money for expenses and Latouche would deposit his full time employment check into the MDD account. Then Latouche would withdraw some money for his personal expenses.

The MDD device operated on common household power. Cartelli informed Latouche that the device needed to be modified to use various power sources supplied by various countries. Cartelli told Latouche that Scafidi had special electrical power transformers manufactured in Detroit.

At one point in time, Cartelli informed Latouche that Cartelli needed $15,000.00 to pay a state tax. If the state tax was not paid, the state would arrest Latouche and Maine for not

196D-NH-40566

Continuation of FD-302 of __Albert D. Latouche__ , On __5/10/2001__ , Page __8__

paying the tax, since they had registered the company. Latouche solicited his wife's aunt to take a loan for the money. Latouche's wife's aunt acquired a loan and gave the money to Latouche, which he then provided to Cartelli. Latouche promised his wife's aunt that Waste Management was going to purchase MDD soon and he would be able to pay her back soon.

    Investors did inquired about the repayment of their investment and the specified repayment date. Latouche would tell the investors that "things" were moving forward and convinced the investors to wait and allow MDD to delay the repayment of their investment.

    Cartelli telephoned Latouche in August, 2000 at approximately 12:30 am. Cartelli stated that he needed $5,000.00 to pay the telephone bill and clear things up. Cartelli stated he had a guy named Charlie ready to loan him $1,000,000.00 to pay off the investors. Cartelli stated he was calling from Walter Reid Hospital in Washington, D.C.

    Latouche again spoke to Cartelli on August 18, 2000. Latouche spoke with Cartelli via speaker telephone and the conversation was overheard by Latouche's wife, Latouche's son, and Latouche's Private Investigator, D.D. Saccente.

    Mackin continues to run an advertisement business called Great Thoughts Sell and uses the same initials as GTS. Mackin has two or three woman currently working for her and one woman talks to Latouche's daughter-in-law.

    Latouche invested or spent a total of $250,000.00 of personal money for the GTS/MDD business. Latouche's money paid for office space, employee salaries, and expenses regarding GTS/MDD.

    Latouche's Private Investigator, Saccente provided a written summary of what Latouche has told him. Saccente's summary also includes a written account of the telephone conversation between Latouche and Cartelli on Thursday, August 18, 2000.